(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SCHRIRO, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS *v.* LANDRIGAN AKA HILL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–1575.  Argued January 9, 2007—Decided May 14, 2007

Respondent Landrigan refused to allow his counsel to present the testimony of his ex-wife and birth mother as mitigating evidence at his sentencing hearing for a felony-murder conviction.  He also interrupted as counsel tried to proffer other evidence, and he told the Arizona trial judge he did not wish to present any mitigating evidence and to "bring on" the death penalty.  The court sentenced him to death, and the sentence was affirmed.  The state postconviction court rejected Landrigan's claim that his counsel was ineffective for failing to conduct further investigation into mitigating circumstances, finding that he had instructed counsel at sentencing not to present any mitigating evidence at all.  Landrigan then filed a federal habeas petition under 28 U. S. C. §2254.  Exercising its discretion, the District Court refused to grant him an evidentiary hearing because he could not make out even a colorable ineffective-assistance-of-counsel claim.  The en banc Ninth Circuit reversed, holding that Landrigan's counsel's performance fell below the standard required by *Strickland* v. *Washington,* 466 U. S. 668.

*Held:* The District Court did not abuse its discretion in refusing to grant Landrigan an evidentiary hearing.  Pp. 6–15.

  (a) The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) has not changed the basic rule that the decision to grant an evidentiary hearing is left to the district court's sound discretion, but it has changed the standards for granting federal habeas relief by prohibiting such relief unless a state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by [this Court]," §2254(d)(1), or "was based on an unreasonable determination

of the facts in light of the evidence presented in the State court pro-
ceeding," §2254(d)(2). Because §2254's deferential standards control
whether to grant habeas relief, a federal court must take into account
those standards in deciding whether an evidentiary hearing is appro-
priate. In deciding whether to grant an evidentiary hearing, a fed-
eral court must consider whether the hearing could enable an appli-
cant to prove the petition's factual allegations, which, if true, would
entitle the applicant to federal habeas relief. It follows that if the re-
cord refutes the applicant's factual allegations or otherwise precludes
habeas relief, a district court is not required to hold an evidentiary
hearing. Pp. 6–8.

 (b) Contrary to the Ninth Circuit's reasoning, the District Court
was well within its discretion to determine that, even with the bene-
fit of an evidentiary hearing, Landrigan could not develop a factual
record entitling him to federal habeas relief. Pp. 8–13.

   (1) The Ninth Circuit concluded that the Arizona state courts'
findings that Landrigan had instructed his counsel not to offer any
mitigating evidence took Landrigan's sentencing colloquy out of con-
text, amounting to an unreasonable determination of the facts. How-
ever, the colloquy's language plainly indicates that Landrigan told
his counsel not to present any mitigating evidence, and the record
conclusively dispels the Circuit's conclusion that Landrigan's state-
ments referred to only his ex-wife's and birth mother's testimony. On
that record, the state court's determination that Landrigan refused to
allow the presentation of any mitigating evidence was a reasonable
determination of the facts. Thus, it was not an abuse of discretion for
the District Court to conclude that Landrigan could not overcome
§2254(d)(2)'s bar to granting federal habeas relief. That court was
entitled to conclude that regardless of what information counsel
might have uncovered in his investigation, Landrigan would have in-
terrupted and refused to allow him to present it. Thus, it could con-
clude that because of his established recalcitrance, Landrigan could
not demonstrate prejudice under *Strickland* even if granted an evi-
dentiary hearing. Pp. 8–10.

   (2) The Ninth Circuit also erred in finding two alternative rea-
sons for its holding. It concluded that the Arizona courts' determina-
tion that Landrigan's claims were frivolous and meritless was an un-
reasonable application of this Court's precedent, based on the belief,
derived from *Wiggins* v. *Smith*, 539 U. S. 510, that his last minute
decision to block testimony could not excuse his counsel's failure to do
an adequate investigation before sentencing. However, this Court
has never addressed a situation in which a client interferes with
counsel's efforts to present mitigating evidence to a sentencing court.
Thus, it was not objectively unreasonable for the Arizona postconvic-

tion court to conclude that a defendant who refused to allow any mitigating evidence to be presented could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence. The Ninth Circuit also found that the record does not indicate that Landrigan's decision was informed and knowing, or that he understood its consequences. This Court has never held that an "informed and knowing" requirement exists with respect to the decision to not introduce mitigating evidence. But even assuming such a requirement exists in this case, Landrigan cannot benefit from it. First, because he never developed his claim properly before the Arizona courts, §2254(e)(2) barred the District Court from granting an evidentiary hearing on that basis. Second, his counsel told the sentencing court in Landrigan's presence that he had carefully explained to Landrigan the importance of mitigating evidence in death penalty cases and his duty as counsel to disclose mitigating factors for consideration. In light of Landrigan's demonstrated propensity for interjecting himself into the proceedings, it is doubtful that he would have sat idly by while counsel lied about such discussions. Third, it is apparent from Landrigan's statement to the sentencing court to bring on the death penalty that he clearly understood the consequences of telling the judge that there were no relevant mitigating circumstances. Pp. 11–13.

(c) The Ninth Circuit also erred in rejecting the District Court's finding that the poor quality of Landrigan's alleged mitigating evidence prevented him from making a colorable prejudice claim. Because most of the evidence that Landrigan now wishes to offer would have been offered by this birth mother and ex-wife had he allowed them to testify, and because the sentencing court had much of the evidence before it by way of counsel's proffer, the District Court could reasonably conclude that any additional evidence would have made no difference in the sentencing. Pp. 13–14.

(d) Even assuming the truth of all the facts Landrigan sought to prove at an evidentiary hearing, he still could not be granted federal habeas relief because the state courts' factual determination that he would not have allowed counsel to present any mitigating evidence at sentencing is not an unreasonable determination of the facts under §2254(d)(2) and the mitigating evidence he seeks to introduce would not have changed the result. Pp. 14–15.

441 F. 3d 638, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1575

DORA B. SCHRIRO, DIRECTOR, ARIZONA DEPART-
MENT OF CORRECTIONS, PETITIONER *v.*
JEFFREY TIMOTHY LANDRIGAN, AKA
BILLY PATRICK WAYNE HILL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 14, 2007]

JUSTICE THOMAS delivered the opinion of the Court.

In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U. S. C. §2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court. Here, the District Court determined that respondent could not make out a colorable claim of ineffective assistance of counsel and therefore was not entitled to an evidentiary hearing. It did so after reviewing the state-court record and expanding the record to include additional evidence offered by the respondent. The Court of Appeals held that the District Court abused its discretion in refusing to grant the hearing. We hold that it did not.

I

Respondent Jeffrey Landrigan was convicted in Oklahoma of second-degree murder in 1982. In 1986, while in custody for that murder, Landrigan repeatedly stabbed another inmate and was subsequently convicted of assault and battery with a deadly weapon. Three years later,

Landrigan escaped from prison and murdered Chester Dean Dyer in Arizona.

An Arizona jury found Landrigan guilty of theft, second-degree burglary, and felony murder for having caused the victim's death in the course of a burglary. At sentencing, Landrigan's counsel attempted to present the testimony of Landrigan's ex-wife and birth mother as mitigating evidence. But at Landrigan's request, both women refused to testify. When the trial judge asked why the witnesses refused, Landrigan's counsel responded that "it's at my client's wishes." App. to Pet. for Cert. D–3. Counsel explained that he had "advised [Landrigan] very strongly that I think it's very much against his interests to take that particular position." *Ibid.* The court then questioned Landrigan:

> "THE COURT: Mr. Landrigan, have you instructed your lawyer that you do not wish for him to bring any mitigating circumstances to my attention?
> "THE DEFENDANT: Yeah.
> "THE COURT: Do you know what that means?
> "THE DEFENDANT: Yeah.
> "THE COURT: Mr. Landrigan, are there mitigating circumstances I should be aware of?
> "THE DEFENDANT: Not as far as I'm concerned."
> *Id.*, at D–3, D–4.

Still not satisfied, the trial judge directly asked the witnesses to testify. Both refused. The judge then asked counsel to make a proffer of the witnesses' testimony. Counsel attempted to explain that the witnesses would testify that Landrigan's birth mother used drugs and alcohol (including while she was pregnant with Landrigan), that Landrigan abused drugs and alcohol, and that Landrigan had been a good father.

But Landrigan would have none of it. When counsel tried to explain that Landrigan had worked in a legitimate

job to provide for his family, Landrigan interrupted and stated "[i]f I wanted this to be heard, I'd have my wife say it." *Id.*, at D–6. Landrigan then explained that he was not only working but also "doing robberies supporting my family." *Id.*, at D–7. When counsel characterized Landrigan's first murder as having elements of self-defense, Landrigan interrupted and clarified: "He didn't grab me. I stabbed him." *Id.*, at D–9. Responding to counsel's statement implying that the prison stabbing involved self-defense because the assaulted inmate knew Landrigan's first murder victim, Landrigan interrupted to clarify that the inmate was not acquainted with his first victim, but just "a guy I got in an argument with. I stabbed him 14 times. It was lucky he lived." *Ibid.*

At the conclusion of the sentencing hearing, the judge asked Landrigan if he had anything to say. Landrigan made a brief statement that concluded, "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.*, at D–16.

The trial judge found two statutory aggravating circumstances: that Landrigan murdered Dyer in expectation of pecuniary gain and that Landrigan was previously convicted of two felonies involving the use or threat of violence on another person. *Id.*, at D–23. In addition, the judge found two nonstatutory mitigating circumstances: that Landrigan's family loved him and an absence of premeditation. *Ibid.* Finally, the trial judge stated that she considered Landrigan "a person who has no scruples and no regard for human life and human beings." *Ibid.* Based on these findings, the court sentenced Landrigan to death. On direct appeal, the Arizona Supreme Court unanimously affirmed Landrigan's sentence and conviction. In addressing an ineffective-assistance-of-counsel claim not relevant here, the court noted that Landrigan had stated his "desire not to have mitigating evidence presented in his behalf." *State* v. *Landrigan,* 176 Ariz. 1,

8, 859 P. 2d 111, 118 (1993).

On January 31, 1995, Landrigan filed a petition for state postconviction relief and alleged his counsel's "fail[ure] to explore additional grounds for arguing mitigation evidence." App. to Pet. for Cert. F–3 (internal quotation marks omitted). Specifically, Landrigan maintained that his counsel should have investigated the "biological component" of his violent behavior by interviewing his biological father and other relatives. *Id.*, at E–2. In addition, Landrigan stated that his biological father could confirm that his biological mother used drugs and alcohol while pregnant with Landrigan. *Ibid.*

The Arizona postconviction court, presided over by the same judge who tried and sentenced Landrigan, rejected Landrigan's claim. The court found that "[Landrigan] instructed his attorney not to present any evidence at the sentencing hearing, [so] it is difficult to comprehend how [Landrigan] can claim counsel should have presented other evidence at sentencing." *Id.*, at F–4. Noting Landrigan's contention that he "'would have cooperated'" had other mitigating evidence been presented, the court concluded that Landrigan's "statements at sentencing belie his new-found sense of cooperation." *Ibid.* Describing Landrigan's claim as "frivolous," *id.*, at F–5, the court declined to hold an evidentiary hearing and dismissed Landrigan's petition. The Arizona Supreme Court denied Landrigan's petition for review on June 19, 1996.

Landrigan then filed a federal habeas application under §2254. The District Court determined, after "expand[ing] the record to include . . . evidence of [Landrigan's] troubled background, his history of drug and alcohol abuse, and his family's history of criminal behavior," *id.*, at C–22, that Landrigan could not demonstrate that he was prejudiced by any error his counsel may have made. Because Landrigan could not make out even a "colorable" ineffective-assistance-of-counsel claim, *id.*, at C–46, the District

Court refused to grant him an evidentiary hearing.

On appeal, a unanimous panel of the Court of Appeals for the Ninth Circuit affirmed, but the full court granted rehearing en banc, *Landrigan* v. *Stewart*, 397 F. 3d 1235 (2005), and reversed. The en banc Court of Appeals held that Landrigan was entitled to an evidentiary hearing because he raised a "colorable claim" that his counsel's performance fell below the standard required by *Strickland* v. *Washington*, 466 U. S. 668 (1984). 441 F. 3d 638, 650 (CA9 2006). With respect to counsel's performance, the Ninth Circuit found that he "did little to prepare for the sentencing aspect of the case," *id.*, at 643, and that investigation would have revealed a wealth of mitigating evidence, including the family's history of drug and alcohol abuse and propensity for violence.

Turning to prejudice, the court held the Arizona post-conviction court's determination that Landrigan refused to permit his counsel to present any mitigating evidence was "an 'unreasonable determination of the facts.'" *Id.*, at 647 (quoting 28 U. S. C. §2254(d)(2)). The Court of Appeals found that when Landrigan stated that he did not want his counsel to present any mitigating evidence, he was clearly referring only to the evidence his attorney was about to introduce—that of his ex-wife and birth mother. 441 F. 3d, at 646. The court further held that, even if Landrigan intended to forgo the presentation of all mitigation evidence, such a "last-minute decision cannot excuse his counsel's failure to conduct an adequate investigation *prior* to the sentencing." *Id.*, at 647. In conclusion, the court found "a reasonable probability that, if Landrigan's allegations are true, the sentencing judge would have reached a different conclusion." *Id.*, at 650. The court therefore remanded the case for an evidentiary hearing.

We granted certiorari and now reverse.

## II

Prior to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts. *Brown* v. *Allen*, 344 U. S. 443, 463–464 (1953); see also *Townsend* v. *Sain*, 372 U. S. 293, 313 (1963). That basic rule has not changed. See 28 U. S. C. §2254, Rule 8(a) ("[T]he judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted").

AEDPA, however, changed the standards for granting federal habeas relief.[1] Under AEDPA, Congress prohibited federal courts from granting habeas relief unless a state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or the relevant state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §2254(d)(2). The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold. See *Williams* v. *Taylor*, 529 U. S. 362, 410 (2000). AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." §2254(e)(1).

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could

--------

[1] Although not at issue here, AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts. 28 U. S. C. §2254(e)(2).

enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. See, *e.g.*, *Mayes* v. *Gibson*, 210 F. 3d 1284, 1287 (CA10 2000). Because the deferential standards prescribed by §2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. See *id.*, at 1287–1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").[2]

It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing. The Ninth Circuit has recognized this point in other cases, holding that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten* v. *Merkle*, 137 F. 3d 1172, 1176 (1998) (emphasis deleted) (affirming the denial of an evidentiary hearing where the applicant's factual allegations "fl[ew] in the face of logic in light of . . . [the applicant's] deliberate acts which are easily discernible from the record"). This approach is not unique to the Ninth Circuit. See *Anderson* v. *Attorney General of Kan.*, 425 F. 3d 853, 858–859 (CA10 2005) (holding that no evidentiary hearing is required if the applicant's allegations are contravened by the existing record); cf. *Clark* v. *Johnson*, 202 F. 3d 760, 767 (CA5 2000) (holding that no hearing is required when the applicant has failed to present clear and convincing evidence to rebut a state court's factual findings); *Campbell* v. *Vaughn*, 209 F. 3d 280, 290 (CA3 2000) (same).

This principle accords with AEDPA's acknowledged

---

[2] Indeed, the Court of Appeals below, recognizing this point, applied §2254(d)(2) to reject certain of the Arizona court's factual findings that established a hearing would be futile.

purpose of "reduc[ing] delays in the execution of state and federal criminal sentences." *Woodford* v. *Garceau*, 538 U. S. 202, 206 (2003) (citing *Williams* v. *Taylor, supra,* at 386 (opinion of STEVENS, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts. With these standards in mind, we turn to the facts of this case.

### III

For several reasons, the Court of Appeals believed that Landrigan might be entitled to federal habeas relief and that the District Court, therefore, abused its discretion by denying Landrigan an evidentiary hearing. To the contrary, the District Court was well within its discretion to determine that, even with the benefit of an evidentiary hearing, Landrigan could not develop a factual record that would entitle him to habeas relief.

### A

The Court of Appeals first addressed the State's contention that Landrigan instructed his counsel not to offer any mitigating evidence. If Landrigan issued such an instruction, counsel's failure to investigate further could not have been prejudicial under *Strickland.* The Court of Appeals rejected the findings of "the Arizona Supreme Court (on direct appeal) and the Arizona Superior Court (on habeas review)" that Landrigan instructed his counsel not to introduce any mitigating evidence. 441 F. 3d, at 646. According to the Ninth Circuit, those findings took Landrigan's colloquy with the sentencing court out of context in a manner that "amounts to an 'unreasonable determi-

nation of the facts.'"  *Id.*, at 647 (quoting 28 U. S. C. §2254(d)(2)).

Upon review of record material and the transcripts from the state courts, we disagree.  As a threshold matter, the language of the colloquy plainly indicates that Landrigan informed his counsel not to present any mitigating evidence.  When the Arizona trial judge asked Landrigan if he had instructed his lawyer not to present mitigating evidence, Landrigan responded affirmatively.  Likewise, when asked if there was any relevant mitigating evidence, Landrigan answered, "Not as far as I'm concerned."  App. to Pet. for Cert. D–4.  These statements establish that the Arizona postconviction court's determination of the facts was reasonable.  And it is worth noting, again, that the judge presiding on postconviction review was ideally situated to make this assessment because she is the same judge that sentenced Landrigan and discussed these issues with him.

Notwithstanding the plainness of these statements, the Court of Appeals concluded that they referred to only the specific testimony that counsel planned to offer—that of Landrigan's ex-wife and birth mother.  The Court of Appeals further concluded that Landrigan, due to counsel's failure to investigate, could not have known about the mitigating evidence he now wants to explore.  The record conclusively dispels that interpretation.  First, Landrigan's birth mother would have offered testimony that overlaps with the evidence Landrigan now wants to present.  For example, Landrigan wants to present evidence from his biological father that would "confirm [his biological mother's] alcohol and drug use during her pregnancy." *Id.*, at E–2.  But the record shows that counsel planned to call Landrigan's birth mother to testify about her "drug us[e] during her pregnancy," *id.*, at D–10, and the possible effects of such drug use.  Second, Landrigan interrupted repeatedly when counsel tried to proffer anything that

could have been considered mitigating.  He even refused to
allow his attorney to proffer that he had worked a regular
job at one point.  *Id.*, at D–6, D–7.  This behavior confirms
what is plain from the transcript of the colloquy: that
Landrigan would have undermined the presentation of
any mitigating evidence that his attorney might have
uncovered.

On the record before us, the Arizona court's determina-
tion that Landrigan refused to allow the presentation of
any mitigating evidence was a reasonable determination
of the facts.  In this regard, we agree with the initial Court
of Appeals panel that reviewed this case:

> "In the constellation of refusals to have mitigating evi-
> dence presented . . . this case is surely a bright star.
> No other case could illuminate the state of the client's
> mind and the nature of counsel's dilemma quite as
> brightly as this one.  No flashes of insight could be
> more fulgurous than those which this record sup-
> plies."  *Landrigan* v. *Stewart*, 272 F. 3d 1221, 1226
> (CA9 2001).

Because the Arizona postconviction court reasonably
determined that Landrigan "instructed his attorney not to
bring any mitigation to the attention of the [sentencing]
court," App. to Pet. for Cert. F–4, it was not an abuse of
discretion for the District Court to conclude that Landri-
gan could not overcome §2254(d)(2)'s bar to granting fed-
eral habeas relief.  The District Court was entitled to
conclude that regardless of what information counsel
might have uncovered in his investigation, Landrigan
would have interrupted and refused to allow his counsel to
present any such evidence.  Accordingly, the District Court
could conclude that because of his established recalci-
trance, Landrigan could not demonstrate prejudice under
*Strickland* even if granted an evidentiary hearing.

B

The Court of Appeals offered two alternative reasons for holding that Landrigan's inability to make a showing of prejudice under *Strickland* did not bar any potential habeas relief and, thus, an evidentiary hearing.

1

The Court of Appeals held that, even if Landrigan did not want any mitigating evidence presented, the Arizona courts' determination that Landrigan's claims were "'frivolous' and 'meritless' was an unreasonable application of United States Supreme Court precedent." 441 F. 3d, at 647 (citing 28 U. S. C. §2254(d)(1)). This holding was founded on the belief, derived from *Wiggins* v. *Smith*, 539 U. S. 510 (2003), that "Landrigan's apparently last-minute decision cannot excuse his counsel's failure to conduct an adequate investigation *prior* to the sentencing." 441 F. 3d, at 647.

Neither *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court. *Wiggins*, *supra*, at 523 ("[W]e focus on whether the investigation supporting *counsel's* decision not to introduce mitigating evidence of Wiggins' background was itself reasonable" (emphasis added and deleted)). Indeed, we have never addressed a situation like this. In *Rompilla* v. *Beard*, 545 U. S. 374, 381 (2005), on which the Court of Appeals also relied, the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented. In short, at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.

2

The Court of Appeals also stated that the record does not indicate that Landrigan's decision not to present mitigating evidence was "informed and knowing," 441 F. 3d, at 647, and that "[t]he trial court's dialogue with Landrigan tells us little about his understanding of the consequences of his decision." *Ibid.* We have never imposed an "informed and knowing" requirement upon a defendant's decision not to introduce evidence. Cf., *e.g.*, *Iowa* v. *Tovar*, 541 U. S. 77, 88 (2004) (explaining that waiver of the right to counsel must be knowing and intelligent). Even assuming, however, that an "informed and knowing" requirement exists in this case, Landrigan cannot benefit from it, for three reasons.

First, Landrigan never presented this claim to the Arizona courts.[3] Rather, he argued that he would have complied had other evidence been offered. Thus, Landrigan failed to develop this claim properly before the Arizona courts, and §2254(e)(2) therefore barred the District Court from granting an evidentiary hearing on that basis.

Second, in Landrigan's presence, his counsel told the sentencing court that he had carefully explained to Landrigan the importance of mitigating evidence, "especially concerning the fact that the State is seeking the death penalty." App. to Pet. for Cert. D–3. Counsel also told the court that he had explained to Landrigan that as counsel, he had a duty to disclose "any and all mitigating factors . . . to th[e] [c]ourt for consideration regarding the sentencing." *Ibid.* In light of Landrigan's demonstrated propensity for interjecting himself into the proceedings, it is

———————

[3] Landrigan made this argument for the first time in a motion for rehearing from the denial of his postconviction petition. Under Arizona law, a defendant cannot raise new claims in a motion for rehearing. *State* v. *Byers*, 126 Ariz. 139, 142, 613 P. 2d 299, 302 (App. 1980), overruled on other grounds, *State* v. *Pope*, 130 Ariz. 253, 635 P. 2d 846 (1981) (en banc).

doubtful that Landrigan would have sat idly by while his counsel lied about having previously discussed these issues with him. And as Landrigan's counsel conceded at oral argument before this Court, we have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence. Tr. of Oral Arg. 26.

Third, the Court of Appeals overlooked Landrigan's final statement to the sentencing court: "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." App. to Pet. for Cert. D–16. It is apparent from this statement that Landrigan clearly understood the consequences of telling the judge that, "as far as [he was] concerned," there were no mitigating circumstances of which she should be aware. *Id.*, at D–4.

## IV

Finally, the Court of Appeals erred in rejecting the District Court's finding that the poor quality of Landrigan's alleged mitigating evidence prevented him from making "a colorable claim" of prejudice. App. to Pet. for Cert. C–46. As summarized by the Court of Appeals, Landrigan wanted to introduce as mitigation evidence:

> "[that] he was exposed to alcohol and drugs *in utero,* which may have resulted in cognitive and behavioral deficiencies consistent with fetal alcohol syndrome. He was abandoned by his birth mother and suffered abandonment and attachment issues, as well as other behavioral problems throughout his childhood.
> His adoptive mother was also an alcoholic, and Landrigan's own alcohol and substance abuse began at an early age. Based on his biological family's history of violence, Landrigan claims he may also have been genetically predisposed to violence." 441 F. 3d, at 649.

As explained above, all but the last sentence refer to

information that Landrigan's birth mother and ex-wife could have offered if Landrigan had allowed them to testify. Indeed, the state postconviction court had much of this evidence before it by way of counsel's proffer. App. to Pet. for Cert. D–21. The District Court could reasonably conclude that any additional evidence would have made no difference in the sentencing.

In sum, the District Court did not abuse its discretion in finding that Landrigan could not establish prejudice based on his counsel's failure to present the evidence he now wishes to offer. Landrigan's mitigation evidence was weak, and the postconviction court was well acquainted with Landrigan's exceedingly violent past and had seen first hand his belligerent behavior. Again, it is difficult to improve upon the initial Court of Appeals panel's conclusion:

> "The prospect was chilling; before he was 30 years of age, Landrigan had murdered one man, repeatedly stabbed another one, escaped from prison, and within two months murdered still another man. As the Arizona Supreme Court so aptly put it when dealing with one of Landrigan's other claims, '[i]n his comments [to the sentencing judge], defendant not only failed to show remorse or offer mitigating evidence, but he flaunted his menacing behavior.' On this record, assuring the court that genetics made him the way he is could not have been very helpful. There was no prejudice." 272 F. 3d, at 1229 (citations and footnote omitted).

## V

The Court of Appeals erred in holding that the District Court abused its discretion in declining to grant Landrigan an evidentiary hearing. Even assuming the truth of all the facts Landrigan sought to prove at the evidentiary hearing, he still could not be granted federal habeas relief

because the state courts' factual determination that Landrigan would not have allowed counsel to present any mitigating evidence at sentencing is not an unreasonable determination of the facts under §2254(d)(2) and the mitigating evidence he seeks to introduce would not have changed the result. In such circumstances, a District Court has discretion to deny an evidentiary hearing. The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–1575

_____

## DORA B. SCHRIRO, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, PETITIONER *v.* JEFFREY TIMOTHY LANDRIGAN, AKA BILLY PATRICK WAYNE HILL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 14, 2007]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Significant mitigating evidence—evidence that may well have explained respondent's criminal conduct and unruly behavior at his capital sentencing hearing—was unknown at the time of sentencing. Only years later did respondent learn that he suffers from a serious psychological condition that sheds important light on his earlier actions. The reason why this and other mitigating evidence was unavailable is that respondent's counsel failed to conduct a constitutionally adequate investigation. See *Wiggins* v. *Smith*, 539 U. S. 510 (2003). In spite of this, the Court holds that respondent is not entitled to an evidentiary hearing to explore the prejudicial impact of his counsel's inadequate representation. It reasons that respondent "would have" waived his right to introduce any mitigating evidence that counsel might have uncovered, *ante*, at 10, 13, and that such evidence "would have" made no difference in the sentencing anyway, *ante*, at 14. Without the benefit of an evidentiary hearing, this is pure guesswork.

The Court's decision rests on a parsimonious appraisal of a capital defendant's constitutional right to have the sentencing decision reflect meaningful consideration of all

relevant mitigating evidence, see, *e.g.*, *Abdul-Kabir* v. *Quarterman*, 550 U. S. ___ (2007); *Skipper* v. *South Carolina*, 476 U. S. 1 (1986); *Lockett* v. *Ohio*, 438 U. S. 586 (1978), a begrudging appreciation of the need for a knowing and intelligent waiver of constitutionally protected trial rights, see, *e.g.*, *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973); *Johnson* v. *Zerbst*, 304 U. S. 458 (1938), and a cramped reading of the record. Unlike this Court, the en banc Court of Appeals properly accounted for these important constitutional and factual considerations. Its narrow holding that the District Court abused its discretion in denying respondent an evidentiary hearing should be affirmed. See *Townsend* v. *Sain*, 372 U. S. 293, 312, 318 (1963); see also 28 U. S. C. §2254 Rule 8(a) (2000 ed., Supp. IV).

I

No one, not even the Court, seriously contends that counsel's investigation of possible mitigating evidence was constitutionally sufficient. See *Wiggins*, 539 U. S., at 521; *Strickland* v. *Washington*, 466 U. S. 668, 688 (1984). Indeed, both the majority and dissenting judges on the en banc Court of Appeals agreed that "counsel's limited investigation of Landrigan's background fell below the standards of professional representation prevailing" at the time of his sentencing hearing. 441 F. 3d 638, 650 (CA9 2006) (Bea, J., dissenting); see *id.*, at 643–645 ("On the record before us, it appears that Landrigan's counsel did little to prepare for the sentencing aspect of the case. . . . A comparison of the results of the minimal investigation by [counsel] with the amount of available mitigating evidence Landrigan claims was available leaves us with grave doubts whether Landrigan received effective assistance of counsel during his penalty phase proceeding"). The list of evidence that counsel failed to investigate is long. For instance, counsel did not complete a psychological evalua-

tion of respondent, which we now know would have uncovered a serious organic brain disorder. He failed to consult an expert to explore the effects of respondent's birth mother's drinking and drug use during pregnancy. And he never developed a history of respondent's troubled childhood with his adoptive family—a childhood marked by physical and emotional abuse, neglect by his adoptive parents, his own serious substance abuse problems (including an overdose in his eighth or ninth grade classroom), a stunted education, and recurrent placement in substance abuse rehabilitation facilities, a psychiatric ward, and police custody. See Declaration by Shannon Sumpter, App. 180–192. Counsel's failure to develop this background evidence was so glaring that even the sentencing judge noted that she had "received very little information concerning the defendant's difficult family history." App. to Pet. for Cert. D–21.[1] At the time of sentencing, counsel was only prepared to put on the testimony by respondent's ex-wife and birth mother. By any measure, and especially for a capital case, this meager investigation "fell below an objective standard of reasonableness." *Strickland*, 466 U. S., at 688.

Given this deficient performance, the only issue is whether counsel's inadequate investigation prejudiced the outcome of sentencing. The bulk of the Court's opinion argues that the District Court reasonably found that respondent waived his right to present any and all miti-

_____

[1] Even more troubling is that prior to sentencing, counsel had clues for where to find this important mitigating evidence. As the Court of Appeals noted, respondent has alleged that his birth mother sent a letter to counsel explaining that "(1) Landrigan began drinking at an early age because his adoptive mother was an alcoholic and would walk around nude in front of him, (2) Landrigan's father was on death row in Arkansas and the 'blood link to Darrel [and] I are what has messed up his whole life,' and (3) 'Jeff needs help mentally like his father did.'" 441 F. 3d 638, 644 (CA9 2006) (en banc). Counsel failed to follow up on any of these leads.

gating evidence. See *ante*, at 8–13. As I shall explain, this argument finds no support in the Constitution or the record of this case.

## II

It is well established that a citizen's waiver of a constitutional right must be knowing, intelligent, and voluntary. As far back as *Johnson* v. *Zerbst*, we held that courts must "'indulge every reasonable presumption against waiver' of fundamental constitutional rights.'" 304 U. S., at 464. Since then, "[w]e have been unyielding in our insistence that a defendant's waiver of his trial rights cannot be given effect unless it is 'knowing' and 'intelligent.'" *Illinois* v. *Rodriguez*, 497 U. S. 177, 183 (1990) (citing *Zerbst*, 304 U. S. 458).

Twenty-five years after *Zerbst*, our decision in *Schneckloth* v. *Bustamonte* added crucial content to our jurisprudence on the knowing and intelligent waiver of constitutional rights. That case considered whether *Zerbst*'s requirement applied to a citizen's consent to a search or seizure. In determining that it did not, our decision turned on the "vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment." 412 U. S., at 241. We explained:

"The requirement of a 'knowing' and 'intelligent' waiver was articulated in a case involving the validity of a defendant's decision to forgo a right constitutionally guaranteed to protect a fair trial and the reliability of the truth-determining process. . . . Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.,* at 236–237.

We then ran through the extensive list of trial rights to which the knowing-and-intelligent-waiver requirement had already been applied.[2] We further noted that the *Zerbst* requirement had been applied to the "waiver of trial rights in trial-type situations,"[3] and to guilty pleas, which we said must be "carefully scrutinized to determine whether the accused knew and understood all the rights to which he would be entitled at trial."[4] 412 U. S., at 238. If our emphasis on trial rights was not already clear, we went on to state:

> "A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided. . . . The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial." *Id.*, at 241–242.

———————

[2] See, *e.g.*, *Brookhart* v. *Janis,* 384 U. S. 1 (1966) (right to confrontation); *Adams* v. *United States ex rel. McCann*, 317 U. S. 269 (1942) (right to jury trial); *Barker* v. *Wingo*, 407 U. S. 514 (1972) (the right to a speedy trial); *Green* v. *United States*, 355 U. S. 184 (1957) (right to be free from double jeopardy).

[3] See, *e.g.*, *Smith* v. *United States*, 337 U. S. 137 (1949) (waiver of the privilege against compulsory self-incrimination before an administrative agency); *Emspak* v. *United States*, 349 U. S. 190 (1955) (waiver of the privilege against compulsory self-incrimination before a congressional committee); *In re Gault*, 387 U. S. 1 (1967) (waiver of counsel in a juvenile proceeding).

[4] See, *e.g., McCarthy* v. *United States*, 394 U. S. 459 (1969); *Boykin* v. *Alabama*, 395 U. S. 238 (1969); *Von Moltke* v. *Gillies*, 332 U. S. 708 (1948); *Uveges* v. *Pennsylvania*, 335 U. S. 437 (1948).

Given this unmistakable focus on trial rights, it makes little difference that we have not specifically "imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Ante*, at 12. A capital defendant's right to present mitigating evidence is firmly established[5] and can only be exercised at a sentencing *trial*. For a capital defendant, the right to have the sentencing authority give full consideration to mitigating evidence that might support a sentence other than death is of paramount importance—in some cases just as important as the right to representation by counsel protected in *Zerbst* or any of the trial rights discussed in *Schneckloth*. Our longstanding precedent—from *Zerbst* to *Schneckloth* to the only waiver case that the majority cites, *Iowa* v. *Tovar*, 541 U. S. 77 (2004)[6]—requires that any waiver of the right to adduce such evidence be knowing, intelligent, and voluntary. As such, the state postconviction court's conclusion that respondent completely waived his right to present mitigating evidence involved an unreasonable application of clearly established federal law as determined by this Court. See 28 U. S. C. §2254(d)(1).

Respondent's statements at the sentencing hearing do not qualify as an informed waiver under our precedents. To understand why, it is important to remember the context in which the waiver issue arose. In all of his postconviction proceedings, respondent has never brought a freestanding claim that he failed to knowingly or intelligently waive his right to present mitigating evidence. See *Keeney*

---

[5] See, *e.g.*, *Abdul-Kabir* v. *Quarterman*, 550 U. S. ___ (2007); *Brewer* v. *Quarterman*, 550 U. S. ___ (2007); *Skipper* v. *South Carolina*, 476 U. S. 1 (1986); *Lockett* v. *Ohio*, 438 U. S. 586 (1978).

[6] See *Tovar*, 541 U. S., at 81 ("Waiver of the right to counsel, *as of constitutional rights in the criminal process generally*, must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances'" (quoting *Brady* v. *United States*, 397 U. S. 742, 748 (1970); emphasis added)).

v. *Tamayo-Reyes*, 504 U. S. 1 (1992) (considering a claim that a defendant's guilty plea was not knowing and intelligent). That is because respondent believes he never waived his right to present all available mitigating evidence. See Brief for Respondent 20 ("Landrigan has alleged that . . . he intended at most to forgo his right to put on his ex-wife and birth mother as witnesses"); Part III, *infra*. Respondent's only claim is that his counsel was ineffective for failing to investigate and present mitigating evidence.

In light of this posture, the Court's conclusion that respondent cannot make a knowing-and-intelligent-waiver argument because he failed to present it in the Arizona courts is nothing short of baffling. See *ante*, at 12. Respondent never intended for waiver to become an issue because he never thought it was an issue. Waiver only became a concern when he was forced to answer: (1) the State's argument that he could not establish prejudice under *Strickland* because he waived the right to present all mitigating evidence; and (2) the state postconviction court's conclusion that "[s]ince the defendant instructed his attorney not to bring any mitigation to the attention of the court, he cannot now claim counsel was ineffective because he did not 'explore additional grounds for arguing mitigation evidence.'" App. to Pet. for Cert. F–4. It is instructive that both the State and the postconviction court considered the waiver issue within the context of the prejudice prong of respondent's ineffective-assistance-of-counsel claim. Even now, respondent's only "claim" within the meaning of 28 U. S. C. §2254(e)(2) is that his counsel was ineffective for not adequately investigating and presenting mitigating evidence. An *argument*—particularly one made in the alternative and in response to another party—is fundamentally different from a *claim*. Cf. *Yee* v.

*Escondido*, 503 U. S. 519, 534 (1992).[7]

Turning back to that claim, respondent's purported waiver can only be appreciated in light of his counsel's deficient performance. To take just one example, respondent's counsel asked a psychologist, Dr. Mickey McMahon, to conduct an initial interview with respondent. But Dr. McMahon has submitted an affidavit stating that his experience was "quite different from the working relationship [he] had with counsel on other death penalty cases in which the psychological study went through a series of steps." Declaration by Mickey McMahon, App. 247. In this case, Dr. McMahon was "not authorized to conduct the next step in psychological testing that would have told [him] if . . . there were any cognitive or neuropsychological deficits not observed during just an interview." *Id.*, at 246. Even though Dr. McMahon told respondent's counsel that "much more work was needed to provide an appropriate psychological study for a death penalty case," *ibid.,* coun-

―――――――――

[7] The Court also misapplies §2254(e)(2) by failing to account for our holding that "[u]nder the opening clause of §2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is *lack of diligence*, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams* v. *Taylor*, 529 U. S. 420, 432 (2000) (emphasis added). "Diligence . . . depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.*, at 435. At the time petitioner filed his state postconviction petition, he was under the impression that he had not waived his right to present all mitigating evidence. Once the state postconviction court informed him otherwise, he immediately raised this argument in a motion for rehearing. See *ante*, at 12, n. 3. The consequence of today's decision is that prisoners will be forced to file separate claims in anticipation of every possible argument that might be made in response to their genuine claims. That is no way to advance "[the Antiterrrorism and Effective Death Penalty Act of 1996's] acknowledged purpose of reduc[ing] delays in the execution of state and federal criminal sentences." *Ante*, at 7–8 (internal quotation marks omitted).

sel refused to let him investigate any further.[8]

A more thorough investigation would have revealed that respondent suffers from an organic brain disorder. See *Abdul-Kabir*, 550 U. S., at ___ (slip op., at 27) (recognizing that "possible neurological damage" is relevant mitigating evidence). Years after Dr. McMahon's aborted examination, another psychologist, Dr. Thomas C. Thompson, conducted a complete analysis of respondent. Based on extensive interviews with respondent and several of his family members, a review of his family history, and multiple clinical tests, Dr. Thompson diagnosed respondent with Antisocial Personality Disorder. See Declaration by Thomas C. Thompson, App. 149. Dr. Thompson filed an affidavit in the District Court describing his diagnosis:

> "[Respondent's] actions did not constitute a lifestyle choice in the sense of an individual operating with a large degree of freedom, as we have come to define free will. The inherited, prenatal, and early developmental factors severely impaired Mr. Landrigan's ability to function in a society that expects individuals to operate in an organized and adaptive manner, taking into account the actions and consequences of their behaviors and their impact on society and its individual members. Based on evaluation and investigation along with other relevant data, this type of responsible functioning is simply beyond Mr. Landrigan and, as far back as one can go, there is no indication that he ever had these capacities." *Id.*, at 160.

--------

[8] An investigator named George LaBash had a similar experience with respondent's counsel. Although counsel had hired LaBash to look into respondent's case, LaBash stated in an affidavit that counsel "did not ask me to do much." Declaration by George LaBash, App. 242. In fact, LaBash spent only 13 hours working on the case, never conducted a mitigation investigation, and described his experience working with respondent's counsel as "quite frustrating." *Id.*, at 242–243.

On the day of the sentencing hearing, the only mitigating evidence that respondent's counsel had investigated was the testimony of respondent's birth mother and ex-wife. None of this neuropsychological information was available to respondent at the time of his purported waiver. Yet the Court conspicuously avoids any mention of respondent's organic brain disorder. It instead provides an incomplete list of other mitigating evidence that respondent would have presented and incorrectly assumes that respondent's birth mother and ex-wife would have covered it all. See *ante*, at 9, 13. Unless I missed the portion of the record indicating that respondent's ex-wife and birth mother were trained psychologists, neither could have offered expert testimony about respondent's organic brain disorder.

It is of course true that respondent was aware of many of the individual pieces of mitigating evidence that contributed to Dr. Thompson's subsequent diagnosis. He knew that his birth mother abandoned him at the age of six months, see App. 147; that his biological family had an extensive criminal history, see *id.,* at 146–147; that his adoptive mother had "affective disturbances and chronic alcoholism," *id.,* at 148; that she routinely drank vodka until she passed out, see *id.,* at 184; that she would frequently strike him, once even "hit[ting him] with a frying pan hard enough to leave a dent," *id.,* at 183, 185; that his childhood was difficult and he exhibited abandonment and attachment problems at an early age, see *id.,* at 148; that he had a bad temper and often threw violent tantrums as a child, see *id.,* at 182; and that he "began getting into trouble and using alcohol and drugs at an early age and, by adolescence, he had begun a series of placements in juvenile detention facilities, a psychiatric ward, and twice in drug abuse rehabilitation programs," *id.,* at 148. Perhaps respondent also knew that his biological mother abused alcohol and amphetamines during her pregnancy,

and that *in utero* exposure to drugs and alcohol has deleterious effects on the child. See *id.,* at 155–156.

But even if respondent knew all these things, we cannot assume that he could understand their consequences the way an expert psychologist could. Without years of advanced education and a battery of complicated testing, respondent could not know that these experiences resulted in a serious organic brain disorder or what effect such a disorder might have on his behavior. And precisely because his counsel failed to conduct a proper investigation, he did not know that this important evidence was available to him when he purportedly waived the right to present mitigating evidence. It is hard to see how respondent's claim of *Strickland* prejudice can be prejudiced by counsel's *Strickland* error. See *Hill* v. *Lockhart*, 474 U. S. 52, 58–59 (1985).

Without ever acknowledging that respondent lacked this information, the Court clings to counsel's discussion with respondent about "the importance of mitigating evidence." *Ante*, at 12. The majority also places great weight on the fact that counsel explained to respondent that, as counsel, he had a "duty to disclose 'any and all mitigating factors . . . to th[e] [c]ourt for consideration regarding the sentencing.'" *Ibid.* Leaving aside the fact that counsel's deficient performance did not demonstrate an understanding of the "importance of mitigating evidence"—let alone knowledge of "'any and all'" such evidence—counsel's abstract explanation cannot satisfy the demands of *Zerbst* and *Schneckloth*. Unless respondent knew of the most significant mitigation evidence available to him, he could not have made a knowing and intelligent waiver of his constitutional rights. See *Battenfield* v. *Gibson*, 236 F. 3d 1215, 1229–1233 (CA10 2001) (holding a defendant's waiver invalid where there was "no indication [counsel] explained . . . what specific mitigation evidence was available"); *Coleman* v. *Mitchell*, 268 F. 3d 417, 447–448 (CA6 2001);

see generally *Tovar*, 541 U. S., at 88.

## III

Even if the putative waiver had been fully informed, the Arizona postconviction court's determination that respondent "instructed his attorney not to bring any mitigation to the attention of the [sentencing] court" is plainly contradicted by the record. App. to Pet. for Cert. F–4. The Court nevertheless defers to this finding, concluding that it was not an "unreasonable determination of the facts" under 28 U. S. C. §2254(d)(2). "[I]n the context of federal habeas," however, "deference does not imply abandonment or abdication of judicial review." *Miller-El* v. *Cockrell*, 537 U. S. 322, 340 (2003). A careful examination of the "record material and the transcripts from the state courts," *ante*, at 9, does not indicate that respondent intended to make a waiver that went beyond the testimony of his birth mother and ex-wife.

The Court reads the following exchange as definitive proof that respondent "informed his counsel not to present any mitigating evidence," *ibid.:*

> "THE COURT: Mr. Landrigan, have you instructed your lawyer that you do not wish for him to bring any mitigating circumstances to my attention?
> "THE DEFENDANT: Yeah.
> "THE COURT: Do you know what that means?
> "THE DEFENDANT: Yeah.
> "THE COURT: Mr. Landrigan, are there mitigating circumstances I should be aware of?
> "THE DEFENDANT: Not as far as I'm concerned."
> App. to Pet. for Cert. D–3 to D–4.

The Court also infers from respondent's disruptive behavior at the sentencing hearing that he "would have undermined the presentation of any mitigating evidence that his attorney might have uncovered." *Ante*, at 10. But this

record material does not conclusively establish that re-
spondent would have waived his right to present other
mitigating evidence if his counsel had made it available to
him.

The brief exchange between respondent and the trial
court must be considered in the context of the *entire* sen-
tencing proceeding. The above-quoted dialogue came
immediately after a lengthy colloquy between the trial
court and respondent's counsel:

> "MR. FARRELL: Your Honor, at this time . . . I have
> two witnesses that I wished to testify before this
> Court, one I had brought in from out of state and is
> my client's ex-wife, Ms. Sandy Landrigan. The sec-
> ond witness is my client's natural mother, Virginia
> Gipson. I believe both of those people had some im-
> portant evidence that I believed the Court should
> take into mitigation concerning my client. *However,
> Mr. Landrigan has made it clear to me . . . that he
> does not wish anyone from his family to testify on his
> behalf today.*
>
> "I have talked with Sandra Landrigan, his ex-wife. I
> have talked a number of times with her and confirmed
> what I thought was important evidence that she
> should present for the Court. And I have also talked
> with Ms. Gipson, and her evidence I think is very im-
> portant and should have been brought to this Court's
> attention. Both of them, after talking with Jeff today,
> have agreed with their, in one case son and the other
> ex-husband, they will not testify in his behalf.
>
> "THE COURT: Why not?
>
> "MR. FARRELL: Basically it's at my client's wishes,
> Your Honor. I told him that in order to effectively
> represent him, especially concerning the fact that the
> State is seeking the death penalty, any and all miti-
> gating factors, I was under a duty to disclose those

factors to this Court for consideration regarding the
sentencing.  *He is adamant he does not want any tes-
timony from his family, specifically these two people
that I have here, his mother, under subpoena, and as
well as having flown in his ex-wife.*"  App. to Pet. for
Cert. D–2 to D–3 (emphasis added).

Respondent's answers to the trial judge's questions must
be read in light of this discussion.  When the judge imme-
diately turned from counsel to respondent and asked
about "any mitigating circumstances," the entire proceed-
ing to that point had been about the possible testimony of
his birth mother or ex-wife.  Counsel had only informed
the court that respondent did not want any testimony
"from his family."  *Id.*, at D–3.  Neither counsel nor re-
spondent said anything about other mitigating evidence.
A fair reading of the full sentencing transcript makes clear
that respondent's answers referred only to the testimony
of his ex-wife and birth mother.[9]

What is more, respondent's answers were necessarily
infected by his counsel's failure to investigate.  Respon-
dent does not dispute that he instructed his counsel not to
present his family's testimony.  Brief for Respondent 47
("Landrigan contends that his intent was not to effect a
broad waiver but, instead, merely to waive presentation of

_____

[9] The Court disregards another important contextual clue—that re-
spondent's counsel requested three 30-day continuances to investigate
and prepare a mitigation case, and that respondent consented on the
record to each one.  App. 10, 12–13, 15.  If respondent had instructed
his counsel not to develop any mitigating evidence, his consent would
be difficult to explain.  Similarly, there is clear evidence that respon-
dent cooperated with counsel's minimal investigation.  He allowed
counsel to interview his birth mother and ex-wife, he assisted in coun-
sel's gathering of his medical records, and he freely met with Dr.
McMahon.  See App. to Pet. for Cert. D–2 to D–3; App. 12; *id.,* at 129.
These are not the actions of a man who wanted to present no mitigating
evidence.

testimony from his mother and his ex-wife"). But his limited waiver cannot change the fact that he was unaware that the words "any mitigating circumstances" could include his organic brain disorder, the medical consequences of his mother's drinking and drug use during pregnancy, and his abusive upbringing with his adoptive family.[10] In respondent's mind, the words "any mitigating circumstances" just meant the incomplete evidence that counsel offered to present. As the en banc Court of Appeals explained, "[h]ad his lawyer conducted an investigation and uncovered other types of mitigating evidence, Landrigan might well have been able to direct the court to other mitigating circumstances." 441 F. 3d, at 646. It is therefore error to read respondent's simple "Yeah" and "Not as far as I'm concerned" as waiving anything other than the little he knew was available to him.

Accordingly, the state postconviction court's finding that petitioner waived his right to present any mitigating evidence was an unreasonable determination of the facts under §2254(d)(2). While the Court is correct that the postconviction judge was the same judge who sentenced respondent, we must remember that her postconviction opinion was written in 1995—*five years* after the sentencing proceeding. Although the judge's memory deserves some deference, her opinion reflects many of the same

---

[10] Contrary to the Court's contention, see *ante*, at 9, 14, respondent's *birth* mother could not have testified about his difficult childhood with his *adoptive* family. In fact, respondent sought a state postconviction evidentiary hearing so that his adoptive sister could present such evidence. See Petition for Post-Conviction Relief, App. 88 ("Petitioner's sister, Shannon Sumpter, would also have verified that their mother, Mrs. Landrigan, was an alcoholic and that that disease caused significant problems within the family which impacted adversely on Petitioner as he was growing up. . . . She would, moreover, have provided additional information concerning familial problems which preceded the time of sentencing and which may have offered at least a partial explanation of Petitioner's conduct at sentencing").

flaws as does the Court's opinion. Instead of reexamining the entire trial transcript, she only quoted the same two-question exchange with respondent. App. to Pet. for Cert. F–4. And unlike this Court's repeated reference to respondent's behavior at sentencing, she did not mention it at all. Her analysis consists of an incomplete review of the transcript and an unsupported summary conclusion that respondent told his attorney not to present any mitigating evidence.

While I believe that neither the Constitution nor the record supports the Court's waiver holding, respondent is at least entitled to an evidentiary hearing on this question as well as his broader claim of ineffective assistance of counsel. Respondent insists that he never instructed his counsel not to investigate other mitigating evidence. Even the State concedes that there has been no finding on this issue. See, *e.g.*, Brief for Respondent 37 ("'[Judge Kozinski]: There's no [state court] finding at all even by inference as to investigation? There's . . . no finding that . . . the trial court made that goes to Landrigan's attitude about allowing his lawyer to investigate? . . . [Counsel for State]: I would agree'" (quoting Ninth Circuit Oral Argument Audio 43:55–44:30)). He has long maintained that he would have permitted the presentation of mitigating evidence if only counsel was prepared to introduce evidence other than testimony from his birth mother and ex-wife. See, *e.g.*, App. to Pet. for Cert. E–2. Respondent planned to call his counsel at an evidentiary hearing to testify about these very assertions. See App. 126. Because counsel is in the best position to clarify whether respondent gave any blanket instructions not to investigate or present mitigating evidence, the Court is wrong to decide this case before any evidence regarding respondent's instructions can be developed.

## IV

Almost as an afterthought, the Court holds in the alternative that "the District Court did not abuse its discretion in finding that Landrigan could not establish prejudice based on his counsel's failure to present the evidence he now wishes to offer." *Ante*, at 14. It of course does this on a cold and incomplete factual record. Describing respondent's mitigation case as "weak," and emphasizing his "exceedingly violent past" and "belligerent behavior" at sentencing, the Court concludes that there is no way that respondent can establish prejudice with the evidence he seeks to introduce. *Ibid*. This reasoning is flawed in several respects.

First, as has been discussed above but bears repeating, the Court thoroughly misrepresents respondent's mitigating evidence. It is all too easy to view respondent's mitigation case as "weak" when you assume away his most powerful evidence. The Court ignores respondent's organic brain disorder, which would have explained not only his criminal history but also the repeated outbursts at sentencing.[11] It mistakenly assumes that respondent's birth mother and ex-wife could have testified about the medical consequences of fetal alcohol syndrome. And it inaccurately states that these women could have described his turbulent childhood with his adoptive family. We have repeatedly said that evidence of this kind can influence a sentencer's decision as to whether death is the proper punishment. See, *e.g.*, *Wiggins*, 539 U. S., at 535 ("[E]vidence about the defendant's background and char-

---

[11] See Declaration by Thomas C. Thompson, App. 149 (stating that tests revealed that respondent has "deficits with cognitive processing, poor adaptability, incomplete understanding of his surroundings and his effect on others, and *very limited impulse control*" (emphasis added)); *id.*, at 150 (noting that individuals with antisocial personality disorder typically act "irresponsibl[y] across areas of their daily lives with decisions characterized by *impulsivity*" (emphasis added)).

acter is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse" (internal quotation marks omitted)); *Eddings* v. *Oklahoma*, 455 U. S. 104, 115 (1982) ("[T]here can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant"). The evidence here might well have convinced a sentencer that a death sentence was not appropriate.

Second, the aggravating circumstances relied on by the sentencing judge are not as strong as the Court makes them out to be.[12] To be sure, respondent had already committed two violent offenses. But so had Terry Williams, and this Court still concluded that he suffered prejudice when his attorney failed to investigate and present mitigating evidence. See *Williams* v. *Taylor*, 529 U. S. 362, 368 (2000) (noting that Williams confessed to "two separate violent assaults on elderly victims," including one that left an elderly woman in a "'vegetative state'"); *id.*, at 398 ("[T]he graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."). The only other aggravating factor was that Landrigan committed his crime for pecuniary gain[13]—but there

―――――――――

[12] In fact, while the Court's terse prejudice analysis relies heavily on a colorful quote from the original Ninth Circuit panel, see *ante*, at 14, it declines to mention that one judge on that panel switched her vote and joined the en banc majority after further consideration of respondent's mitigating evidence.

[13] Notwithstanding the Court's repeated assertions, the sentencing judge did not consider respondent's courtroom behavior as an aggravating factor. Compare *ante*, at 14, with App. to Pet. for Cert. D–17 to D–18. In fact, the sentencing judge noted that until the day of sentencing, respondent had "acted appropriately in the courtroom" and his conduct

are serious doubts about that. As the en banc Court of Appeals explained, "[t]here was limited evidence regarding the pecuniary gain aggravator. The judge noted that the victim's apartment had been ransacked as if the perpetrator were looking for something, and that this demonstrated an expectation of pecuniary gain, *even though Landrigan did not actually steal anything of value*." 441 F. 3d, at 649 (emphasis added). Thus, while we should not ignore respondent's violent past, it is certainly possible—even likely—that evidence of his neurological disorder, fetal alcohol syndrome, and abusive upbringing would have influenced the sentencing judge's assessment of his moral blameworthiness and altered the outcome of his sentencing. As such, respondent has plainly alleged facts that, if substantiated at an evidentiary hearing, would entitle him to relief. See *Townsend*, 372 U. S., at 312.

## V

In the end, the Court's decision can only be explained by its increasingly familiar effort to guard the floodgates of litigation. Immediately before turning to the facts of this case, it states that "[i]f district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts." *Ante*, at 8. However, habeas cases requiring evidentiary hear-

---

had been "good." *Id.*, at D–22. Even more important, she understood his behavior that day to be a mere "release . . . of his frustration," *ibid.*—not as an aggravating factor and certainly not as an indication of his intent to waive his right to present mitigating evidence. At most, the sentencing judge treated respondent's behavior on the day of sentencing as a reason not to credit his earlier "good" behavior as a mitigating circumstance. In any event, a defendant's poor behavior at trial is not listed as an aggravating factor under Arizona's capital sentencing statute. See Ariz. Rev. Stat. Ann. §13–703(F) (West Supp. 2006).

ings have been "few in number," and "there is no clear evidence that this particular classification of habeas proceedings has burdened the dockets of the federal courts." *Keeney*, 504 U. S., at 24 (KENNEDY, J., dissenting). Even prior to the passage of the Antiterriorism and Effective Death Act of 1996, district courts held evidentiary hearings in only *1.17%* of all federal habeas cases. See Report to the Federal Courts Study Committee of the Subcommittee on the Role of the Federal Courts and their Relation to the States (Mar. 12, 1990) (Richard A. Posner, Chair), in 1 Federal Courts Study Committee, Working Papers and Subcommittee Reports 468–515 (July 1, 1990). This figure makes it abundantly clear that doing justice does not always cause the heavens to fall. The Court would therefore do well to heed JUSTICE KENNEDY's just reminder that "[w]e ought not take steps which diminish the likelihood that [federal] courts will base their legal decision on an accurate assessment of the facts." *Keeney*, 504 U. S., at 24 (dissenting opinion).

It may well be true that respondent would have completely waived his right to present mitigating evidence if that evidence had been adequately investigated at the time of sentencing. It may also be true that respondent's mitigating evidence could not outweigh his violent past. What is certainly true, however, is that an evidentiary hearing would provide answers to these questions. I emphatically agree with the majority of judges on the en banc Court of Appeals that it was an abuse of discretion to refuse to conduct such a hearing in this capital case.

Accordingly, I respectfully dissent.